REGAN, Judge.
Plaintiff, The American Employers’ Insurance Company, the collision insurer of a 1951 Studebaker “wrecker” or service car owned by Muller’s Sanitary Dairy, instituted this suit against the defendant, The Missouri Pacific Railroad Company, endeavoring to recover the sum of $1,000 representing damages incurred by the wrecker on December 21, 1956, at 6:30 A.M. when defendant’s locomotive struck the vehicle when it was parked or stopped on its tracks crossing Central Avenue which are located in the Parish of Jefferson, Louisiana.
Defendant answered and denied liability for the damages sustained by the wrecker, asserting that the sole cause of the accident was the negligence of either, or both, the operator of the wrecker in stopping on the tracks and the driver of the truck being-towed thereby; in the alternative, the defendant pleaded the contributory negligence of the operators of the respective vehicles.
From a judgment in favor of the defendant dismissing plaintiff’s suit, it has prosecuted this appeal.
This case was consolidated with a similar suit arising out of the same accident in order to facilitate and expedite the trial thereof. The suit referred to is entitled Illinois *381 Central Railroad Company v. Muller’s Sanitary Dairy, La.App., 110 So.2d 742, a commercial partnership consisting of Charles R. Muller, Raymond J. Muller, and Louis C. Muller, and the partners individually, our docket No. 21169, which we have this day transferred to the Supreme Court since we have no jurisdiction of the appeal.
The record discloses that when the accident occurred a Missouri Pacific train was moving toward New Orleans on the Illinois Central tracks and struck a wrecker owned by Muller’s Sanitary Dairy, which was' stopped or parked on the tracks which crossed Central Avenue.
The wrecker was hurled to the side of the tracks causing considerable damage both to the vehicle and to the crossing signal light system of the Illinois Central Railroad which, incidentally, forms the subject matter of the other case, above referred to, which we have transferred to the Supreme Court.
Muller’s dairy is located about 100 feet from the Central Avenue crossing where the accident occurred. Earl White, an employee of the dairy, was instructed to tow its truck to the repair shop. O. C. Barlow, also an employee thereof, and Raymond Muller, one of the partners therein, attached a steel cable from the rear of the wrecker, or service car, to the front of the truck. White then drove the wrecker on Central Avenue toward the river, and Barlow steered the disabled truck. There were two tracks to be crossed, the northbound and southbound main lines. The wrecker mounted the slight elevation on which the tracks rested, crossed the northbound main line, and when the wrecker reached the southbound main line, White noticed that the tow line was slipping, and he stopped the wrecker on these tracks and alighted to see what was causing the slippage. Barlow also got out of his truck, and the two men met to consult near the rear of the wrecker. Within a short period of time the adjustment was made, and they started back to their respective vehicles. The wrecker had been parked on the track for four or five minutes when Barlow noticed a train approaching about 200 feet away. He alerted White, and they both had sufficient time to remove themselves from danger before the collision occurred.
In the Central Avenue crossing there was installed in conformity with the requirements of the law of this state a stop sign, and on each side of the crossing there were also erected an automatic yard arm gate and automatic blinking red lights of modern mechanical design approved by the American Association of Railroads.
All of the litigants concede that a prevailing fog limited visibility to about 200 feet, and the trial judge found this as a fact. White testified that when he approached the track the signal gates were up; he heard no whistle, horn, or bell sounded by the train at any time prior tó the accident and that the headlights and the red oscillating light located on the top of the cab of the wrecker were in operation, as were the headlights on the truck being towed. Barlow, the driver of the disabled truck, in substance, corroborated the testimony of Earl White.
Raymond Muller testified that when the accident occurred he was approximately 250 feet removed from the situs of the collision and was peering out of an upstairs rear window of the Muller dairy; despite the fog he said he had a range of visibility of approximately 250 feet, and he in substance reiterated the testimony of both White and Barlow.
The engineer, A. L. Bond, a man possessing 43 years of experience as a locomotive engineer, testified that he approached the crossing at about 30 miles per hour, maintaining a sharp lookout on the right side of the cab, but due to the fog, he was unable to see the wrecker until he was about 100 to 200 feet away. The locomotive was pulling eight cars; he immediately applied the emergency brake as soon as he saw the wrecker and the red light on its cab and brought the train to a good stop *382 within 300 or 400 feet or approximately ISO feet beyond the crossing. Bond asserted that he began blowing the locomotive’s crossing signal whistle about 900 feet from Central Avenue and continued to do so until the collision occurred. He said that the engine bell had been ringing a long distance before approaching the crossing and had been set to ring automatically. The locomotive was equipped with two burning headlights, a steady beacon and the other an oscillating light.
Fireman J. B. George, a man possessing 39 years’ experience as a locomotive fireman, was seated on the left side of the locomotive. He in substance fully corroborated the testimony of the engineer, Bond.
The conductor, B. C. McGhee, was an occupant of the fifth coach behind the locomotive, and he testified that the whistle signals were being blown long before the crossing was reached.
Thomas J. Kremer, Supervisor of Signals for the Illinois Central Railroad Company, related that he learned of the accident at 8 o’clock A.M. and immediately drove to the situs thereof where he observed that the gate and signal light mast on the river side of the crossing had been knocked down by the wrecker after it was struck by the train. He stated that an inspection of the mechanism indicated that the gate had been in the “down position” when hit. The other signal gate and signal light and mast on the lake side of the crossing were in good operating condition.
The plaintiff contends that the stopping or parking of the wrecker on the railroad tracks crossing Central Avenue due to mechanical difficulties did not constitute negligence on the part of the operator thereof; but even if it did, the locomotive crew was operating the train at a rate of speed so great that it could not be stopped within the range of visibility; and therefore the crew, if it had observed the caution dictated by prevailing conditions, would have possessed the last clear chance to avoid the accident.
On the other hand the defendant insists that the proximate cause of the accident was the negligence of the operator of the wrecker in parking on the main line tracks of the railroad company and then in failing to exercise that degree of caution which this position of peril required.
The lower court in its written reasons for judgment expressed the opinion:
“that the driver of the wrecker was negligent in parking the wrecker on the main line track especially in view of the foggy condition of the day and restricted visibility. * * * that the doctrine of last clear chance does not apply * * * inasmuch as the train could not have stopped within the limit of visibility. * * * the Court finds no liability or negligence on the railroad for operating the train at a speed at which it was impossible to stop within the limits of visibility. This crossing is protected by signals * * * the train crew itself gave signals when they were approaching the crossing. The sole and proximate cause of the collision is the stopping of the wrecker on the main line track and that is where the responsibility for damages attaches.”
The question which this appeal has posed for our consideration is whether the foregoing finding of the trial judge is so erroneous and unsupported by the evidence as to warrant a reversal by us.
We are of the opinion that no useful purpose would be served by indulging in a protracted dissection of the foregoing testimony. Our analysis of the record convinces us that the evidence abundantly supports the trial court’s finding of fact, and the judgment is therefore correct.
The law applicable to the facts as revealed herein and as found by the trial court appears to be well settled. The courts have recognized that fog and rain prevent a locomotive’s operators from having good visibility of the tracks ahead, the same as the *383 existence of a curve; and judges have rationalized on innumerable occasions that a railroad company is not required to slow its train during rain or foggy weather.[1]
This train was not moving at a prohibited speed as it approached the environment of this particular crossing, and the crew had no reason to believe that anyone would abandon that degree of care, measured by the yardstick of the reasonable man, and park a vehicle on the main line of a railroad, especially in view of the impaired visibility created by the fog. In determining what is negligent conduct, we have remarked on several occasions that there is no fixed rule; the facts and environmental characteristics of each case must be considered and treated individually in conformity with the true civil law concept. Judicially we are tending more and more towards an appreciation of the truth that, in the last analysis, there are few absolute rules of negligence; there are principally standards and degrees of negligence for the reason that no one is so gifted with foresight that he or she could anticipate every possible human event and prescribe the proper rule for each.
There is no doubt that the reason that the engineer did not see the wrecker sooner, nor did White or Barlow see the locomotive in time to remove the wrecker from the tracks and thus avoid the collision was due to the existence of a fog.
With respect to White’s and Barlow’s failure to observe or hear the railroad’s signals, the whole tenor of the record discloses what actually happened was that the signal system started to operate after the wrecker was parked on the tracks and at a time when White and Barlow were standing in the rear of the wrecker engaged in conversation about the slippage of the tow line to the extent that they were completely oblivious to all of the signals which were then in operation and which would ordinarily have attracted the attention of a man or men not so distracted.
There exists no factual basis for the application herein of the doctrine of last clear chance; the emergency created by the negligence of White and Barlow together with the existence of a fog which limited visibility to 200 feet did not afford the defendant’s crew an actual opportunity to either avoid the collision or to anticipate in any way that we know of the presence of a parked vehicle on the main line tracks of the railroad.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.

. Campbell & Company v. Texas & Pacific Railroad Co., La.App.1934, 152 So. 351; Jeter v. Texas & Pacific Railroad Co., La.App.1933, 149 So. 144; Foster v. Texas and Pacific Railroad Co., 1927, 5 La.App. 601.